UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

AARON L. TUCKER,
            Plaintiff,

vs.                                        CIVIL NO. 2:07-CV-10786

                                           DISTRICT JUDGE DENISE PAGE HOOD
                                           MAGISTRATE JUDGE STEVEN D. PEPE.

MICHAEL J. ASTRUE
COMMISSIONER OF SOCIAL SECURITY,
            Defendant
_____/

## REPORT and RECOMMENDATION

### 1.    Background

Plaintiff, Aaron L. Tucker, brought this action under §1383(c)(3) to challenge a final

decision of the Commissioner finding that Plaintiff was not entitled to Supplemental Social

Security Income (SSI) under Title XVI of the Social Security Act.  Plaintiff and Defendant both

filed motions for summary judgment.  These motions have been referred to the undersigned

pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, IT IS RECOMMENDED

that the Commissioner's motion for summary judgment be GRANTED, and Defendant's motion

be DENIED.


### A.    Procedural History

Plaintiff, Aaron Tucker, applied for supplemental security income ("SSI") on March 29,

2004, alleging disability due problems with his heart, kidneys and liver as well as ulcers, asthma

and depression (Dkt. # 12, p. 2).  Plaintiff's application was denied on October 26, 2006 (Dkt. #

7, p. 2).  Plaintiff appeared, with counsel, at a hearing before administrative law judge ("ALJ")

E. Patrick Golden on June 8, 2006 (R. 594-617).  ALJ Golden issued an Opinion dated October

26, 2006, in which he determined that Plaintiff was not eligible for SSI benefits (R. 14-25).  The

Appeals Council affirmed the ALJ's Decision in a notice dated January 25, 2007 (R. 6-8).

**B.     Background Facts**

      **1.     *Plaintiff's Hearing Testimony and Statements***

Plaintiff was 48 years old at the time of the hearing  (Dkt. # 12, p. 2).  He completed the

11th grade, is single and currently lives with his mother (*Id. &* R. 598).  His mother cooks and

cleans, but Plaintiff can clean for an hour before becoming drowsy (R. 599-600).  Plaintiff stated

that the side effects from his medicine include drowsiness which results in his taking seven to

eight hours of naps per day (R. 600-01).  Plaintiff can stand for 20 - 30 minutes, but standing

causes back and knee pain as well as swelling in his legs.  He elevates his legs three times daily

(R. 604).  He is able to sit for 20 - 25 minutes without stretching (R. 602).  Plaintiff can walk

half a block before becoming winded, and must use his inhaler and rest before resuming his

walking.   Plaintiff is most comfortable lying on the floor (R. 603).

Two weeks prior to the hearing, Plaintiff had a heart attack (R. 602, 605).  Plaintiff has

an irregular heartbeat, and also previously had problems with his pacemaker (R. 605).  Plaintiff

takes blood thinners (R. 606).  He has hepatitis C which causes his stomach to swell and his eyes

to yellow.

Plaintiff's physical complaints include headaches as well as chest and back pain (R. 602).

His headaches arise after taking medication, and last for one and a half to two hours (R. 603-04).


Plaintiff stated that he visited a psychiatrist, but his insurance was cut off before he could

schedule a second visit (R. 599).  He is depressed because he doesn't like being dependant upon

his mother (R. 607).

Plaintiff goes to bed around 11 P.M., wakes up two or three times from coughing, and arises around 9 or 10 A.M. (R. 607-08). Plaintiff uses an Albuterol nebulizer once each morning (R. 608-09). Plaintiff takes other medications when he receives samples from his physicians.

Plaintiff receives $140.00 worth of food stamps each month as well as SDA (R. 610).[1] Plaintiff stated that he previously smoked one or two packs of cigarettes daily, but now only smokes one or two cigarettes each day (R. 611). Plaintiff stopped drinking in February 2004, and is in Alcoholics Anonymous (R. 612-13).

Plaintiff's prior work experience was performing general labor. From 1978 to 1988 he operated heavy equipment (R. 614), but since then he has not had any steady work totaling one year. Plaintiff has mostly performed lawn work,[2] but has done other labor including painting (R. 615).

2.    *Medical Evidence*

Plaintiff has a lengthy medical history from 2000 to 2006 which is set out in detail below. On February 24, 2000, Plaintiff presented at the Henry Ford Hospital's emergency room with flu-like symptoms (R. 194-95). He was coughing up blood, and was diagnosed with acute bronchitis. He was given an injection of Bicillin-CR and prescriptions for doxycycline and Robitussin-DM (R. 195).

---

[1]The record does not indicate what "SDA" means, but it likely refers to State Disability Assistance which "provides cash assistance to disabled adults to help them pay for living expenses such as rent, heat, utilities, clothing, food and personal care items." http://www.michigan.gov/dhs/0,1607,7-124-5453_5526-15189--,00.html (last visited December 3, 2007).

[2]VE Barrett noted that Plaintiff did lawn work for four months.

In April 2000, Plaintiff spent 12 days at the Henry Ford Health System for bacterial pneumonia, secondary dilated cardiomyopathy, acute pulmonary edema, acute respiratory failure, cocaine abuse, alcohol abuse, and chronic obstructive lung disease  (R. 186-193, R. 197-212).  Alcohol withdrawal delirium, acute alcoholic hepatitis, hepatitis C and bacterial septicemia complicated Plaintiff's treatment.  Plaintiff also underwent endotracheal intubation. Plaintiff was admitted for respiratory distress, and was found to have bilateral air space disease which was treated as a pneumonia.  He developed line sepsis with coagulase negative staphylococcus, and was treated with ceftriaxone.  It was noted that Plaintiff had a history of significant cocaine and alcohol abuse and tobacco use, and while hospitalized, underwent withdrawal symptoms.  On April 10, 2000, Plaintiff was extubated, transferred from the floor and continued to slowly improve.  Tests showed that Plaintiff had an enlarged heart, and was informed that due to his cardiac condition he should refrain from drugs and alcohol (R. 187). Plaintiff's medications included atenolol, folic acid, prinivil, robitussin and thiamine (R. 188). On April 2, 2000, Lana Manley, M.D., recorded that Plaintiff had shortness of breath and his cough produced white sputum (R. 192).  Dr. Manley noted that Plaintiff had a history of bronchitis, and that he denied smoking, alcohol or drug abuse.  An X-ray showed bilateral air space disease, right base greater than the left.  On April 5, 2000, Jay L. Pearlberg, M.D., reviewed Plaintiff's chest X-ray finding that Plaintiff's lungs look clear, though there was still infiltrate at both bases; no pleural fluid was seen; and the heart was not enlarged (R. 207).  An ultrasound conducted by Michael A. Sandler, M.D., on April 6, 2000, identified a pleural effusion.  A X-ray reviewed by Milan V. Pantelic, M.D., found that Plaintiff's lung volumes appear slightly lower, heart size remains at the upper limits of normal, air-space disease was

stable and there was no sign of pneumothorax (R. 205-6). On April 9, 2000, Plaintiff's chest X-rays were interpreted by Dr. Pantelic, who found that there may be a slight increase in perihilar mixed disease and bibasal air space disease, borderline enlarged heart is unchanged, there is no evidence of pneumothorax or enlarging effusion and no other interim changes (R. 204). On April 8, 2000, Plaintiff's abdomen X-rays showed multiple loops of nondistended large bowel to the level of the rectum (R. 202). Interpreting physician, Samdudrala Varalaxmi, M.D., noted multiple nondistended loops of small bowel, but no definite obstruction was identified. On April 9, 2000, Dr. Varalaxmi determined that Plaintiff's chest X-rays showed that the tip of the endotracheal tube was 4.5 centimeters above the carina, and there was no significant change (R. 201). April 11, 2000, chest X-rays interpreted by Dr. Pantelic showed unchanged modest cardiac enlargement, diffuse interstitial disease consistent with edema, small bilateral pleural effusions and lowered overall lung volumes (R. 200). On April 12, 2000, Plaintiff's X-rays were reviewed by Tabassum Ahmad, M.D. (resident), who noted that Plaintiff's heart was enlarged and there was congestion of the pulmonary vessels with interstitial pulmonary edema (R. 199).

On April 19, 2000, Plaintiff was treated at the Detroit Department of Health, and medical notes indicated that he recently suffered from pneumonia (R. 229). April 26, 2000, Detroit Department of Health notes indicated that Plaintiff's lungs were improved (R. 228).

On May 16, 2000, Plaintiff visited Park Family Healthcare, and was treated for hepatitis, cardiomyopathy and respiratory problems (R. 222). Plaintiff's cocaine use was discussed and continued cessation was stressed (R. 223). X-ray examination indicated that Plaintiff's lungs were clear, cardiovascular silhouette was within normal ranges and the hilar and vascular structures were unremarkable (R. 224). On May 20, 2000, a physician at Park Family Healthcare

filled out a State of Michigan Family Independence Agency Medical Needs form indicating that Plaintiff needed assistance with meal preparation, shopping/errands, laundry and housework (R. 217). The doctor also indicated that Plaintiff cannot work at usual occupations.

On May 23, 2000, Plaintiff was treated for hepatitis, cardiomyopathy and respiratory problems at Park Family Healthcare (R. 215). Records indicated that Plaintiff had auscultation of heart with notation of abnormal sounds and murmurs, auscultation of lungs and respiratory effort (R. 216). June 2, 2000, notes from Park Family Healthcare indicate that Plaintiff experienced pneumonia (R. 213). On July 11, 2000, Plaintiff was treated at Park Family Healthcare for problems with his lungs and heart (R. 214).

On September 11, 2000, Plaintiff received an internal medical examination of his heart at the Human Capability Corporation (R. 232-34). Examination notes indicated that Plaintiff passed out on April 2, 2000, and required electric shock to bring his heart back (R. 232). The examination diagnosed Plaintiff with hypertension, cardiomegaly, asthma, abdominal pain, hepatitis C and possible peptic ulcer/gastritis (R. 234).

October 14, 2000, notes from Barry Bronstein, D.O., indicate that he treated Plaintiff for cardiomyopathy, COPD, chronic liver disease, hepatitis C, hypertension and alcoholism (R. 235). On November 10, 2000, Herb Weisental, D.O., a radiologist, reported that Plaintiff's echocardiogram showed his cardiac chambers were within normal limits with no evidence of pericardial effusion or mural thrombus formation (R. 335). Cardiac Doppler revealed mild regurgitation at the mitral and tricuspid valves.

On November 19, 2000, Narsimha R. Gottam, M.D., at St. John's Detroit Riverview Hospital, prepared a consultation report regarding Plaintiff's November 9 visit to the hospital (R.

336-27).  Dr. Gottam noted that efforts would be taken to examine Plaintiff's left ventricle.  On November 29, 2000, Plaintiff was seen by Satya Helluri, M.D., at St. John's for a cardiac follow-up (R. 327-28).  Dr. Helluri observed dilated cardiomyopathy with clinical congestive failure likely due to alcohol abuse and hypertension (R. 327).

On December 6, 2000, Milton G. Mutchnick, M.D., Professor, Wayne State University Medical School, conducted an initial exam of Plaintiff after he was referred for a hepatitis C evaluation (R. 325-26).  On January 3, 2001, Firdous A. Siddiqui, M.D., Assistant Professor, Wayne State University Medical School, treated Plaintiff as a first step in his hepatitis C treatment (R. 315-16).  On February 21, 2001, Dr. Siddiqui noted that Plaintiff brought his requested lab results so that development of a hepatitis treatment plan could proceed (R. 307-08).

On February 28, 2001, Dr. Gottam examined Plaintiff and prepared a consultation report stating that Plaintiff suffered from dilated cardiomyopathy and hepatitis C (R. 297-98).  Plaintiff was strongly advised not to smoke or drink, his Accupril prescription was increased and Aladctone 25 mg was added.

On March 21, 2001,  Professor Murray N. Ehrinpreis, M.D., Wayne State, examined Plaintiff's liver biopsy results and developed a plan for treating his hepatitis C with interferon and Ribavirin (R. 299-300).  On March 28, 2001, Dr. Bronstein noted that Plaintiff was scheduled to start interferon and Ribavirin (R. 301-02).  A June 16, 2001, referral form from Affiliated Internists indicated that Plaintiff was subject to the following tests: CBC with complete diff., AST, ALT, BUN, Creatinine, glucose, total bilirubin and uric acid (R. 237).

On April 16, 2001, Dr. Bronstein treated Plaintiff for hepatitis C (R. 295-96).  On May 23, 2001, Dr. Bronstein treated Plaintiff for hypertension, cardiomyopathy, arthritis, and liver

disease (R. 293-94). On June 11, 2001, Dr. Bronstein treated Plaintiff for hypertension, cardiomyopathy, arthritis, and liver disease (R. 290-91). On June 18, 2001, Dr. Bronstein treated Plaintiff for hypertension, cardiomyopathy, arthritis, and liver disease (R. 288-89). On July 16, 2001, Dr. Bronstein treated Plaintiff for hypertension, cardiomyopathy, arthritis, and liver disease (R. 280-81). On August 15, 2001, Dr. Bronstein treated Plaintiff for hypertension, cardiomyopathy, arthritis, and liver disease (R. 277-78). On September 15, 2001, Dr. Bronstein treated Plaintiff for cardiomyopathy, arthritis, bone lesions and drug toxicity (R. 271-72).

On August 24, 2001, Dr. Siddiqui, wrote a progress note stating that Plaintiff is in week 12 of treatment with a combination of interferon and Ribavirin (R. 263). Plaintiff takes Vioxx for muscle and headaches. A December 5, 2001, progress note written by Wayne State Assistant Professor Ravi Dhar, M.D., noted that while Plaintiff was in week 28 of hepatitis C treatment, he missed the two prior weeks because he could not obtain an insurance referral (R. 264-65). Dr. Dhar observed that Plaintiff does not appear to be responding to treatment, and it was discontinued. Plaintiff spoke of feeling social isolation and depression, and was given two months worth of Zoloft. Plaintiff was encouraged to contact the office if his depression worsens.

On January 23, 2002, Dr. Bronstein treated Plaintiff and referred him to Dr. Siddiqui (R. 261-62). On February 21, 2002, Plaintiff was treated by Dr. Hague for hepatitis C and occasional headaches (R. 259).

On February 22, 2002, Plaintiff was seen at Affiliated Internists (R. 241). Notes indicate that Plaintiff was encouraged to see his primary physician about depression, referral to a social worker was made, and Plaintiff was given samples of Vioxx. On March 22, 2002, Plaintiff was unable to be seen due to the fact that his insurance was no longer accepted by Affiliated

Internists (R. 240). On June 28, 2002, Dr. Bronstein treated Plaintiff for his lungs and heart (R. 254).

On January 4, 2003, Plaintiff was treated at Henry Ford Hospital Emergency Room after being assaulted (R. 361-62). The impression was that Plaintiff was intoxicated and received a trauma to head and back (R. 361). X-rays showed no acute intracranial hemorrhage, but an acute fracture of the left maxillary sinus with minimal preseptal orbital edema (R. 365).

On May 8, 2003, Cynthia Shelby-Lane, M.D., of the State of Michigan Disability Services, prepared a narrative report stating that Plaintiff has a history of hypertension, suffered from a heart attack in April 2000, previously had pneumonia in both lungs and a history of headaches requiring medication (R. 368-71). Plaintiff was subject to a psychological examination by R. Hassan, M.D., a psychiatrist, who recorded that Plaintiff denied prior drug use, possesses low self-esteem, used to hear voices and see things under the influence of alcohol, denied suicidal ideation, but admitted to feeling depressed (R. 372-73). Several tests were conducted to determine Plaintiff's mental capacity (R. 373). With regard to immediate memory recall, he could repeat four of four numbers forward and three of four backward. As for recent memory recall, he could name one of three objects after three minutes, and as for past recall he could state his date of birth and the last three United States Presidents. When his understanding of information was assessed, Plaintiff was asked to name five large cities, but named only four; the only famous person he could name was Michael Jordan; and he listed "war" as a current event. Regarding his judgment, Plaintiff was asked what would he would do if he found a stamped, addressed envelope; discovered fire in a theater; and what his future plans were. He replied: "leave it," "get out," and "live."

On June 13, 2003, a Physical Residual Functional Capacity Assessment of Plaintiff was conducted (R. 134-41). The assessment indicated that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or sit about 6 hours a day and placed no restrictions on pushing/pulling (R. 135). On June 24, 2003, Zahra Khademian, M.D., conducted a Psychiatric Review Technique of Plaintiff (R. 142-55) which determined that a residual functional capacity ("RFC") assessment was necessary. Plaintiff was evaluated under Listings 12.04 (affective disorders) and 12.09 (substance addiction disorders) (R. 142). Per Listing 12.04, Plaintiff was determined to possess a depressive syndrome characterized by sleep disturbance, decreased energy, feelings of guilt/worthlessness and difficulty concentrating/thinking which met the listing requirement (R. 145). Under Listing 12.09, it was noted that Plaintiff abused ETOH (R. 150). Dr. Khademian noted that Plaintiff's limitations on daily living and social interaction were moderate, his restrictions in maintaining concentration were described as mild and he had no periods of decompensation (R. 152). On a Mental Functional Capacity Assessment, Plaintiff was not significantly limited in most categories (R. 156).[3]

On June 24, 2003, Plaintiff participated in a Mental Residual Functional Capacity Assessment (R. 156-59). Plaintiff's understanding and memory was listed as "not significantly limited" (R. 156). Sustained Concentration and Persistence were, except for ability to carry out detailed instructions, "not significantly limited." Ability to carry out detailed instructions was

---

[3] Plaintiff's understanding and memory was listed as "not significantly limited" (R. 156). Sustained Concentration and Persistence were, except for ability to carry out detailed instructions and maintain concentration, "not significantly limited." Ability to carry out detailed instructions and concentrate were "moderately limited." Similarly, Plaintiff's social interaction and adaptation were "not significantly limited" except for his ability to "accept instructions and respond appropriately" which was "moderately limited" (*Id.*). Plaintiff's August 2004 mental evaluation was nearly identical (R. 183).

"moderately limited."

On January 23, 2004, Plaintiff was discharged from Detroit Medical Center after being admitted on January 10, 2004, due to a nonsustained V-tach (R. 400-01). Plaintiff suffered an acute myocardial infarction, and had cardiac catheterization and stent placement in the right coronary artery (R. 400). Plaintiff was febrile while in intensive care, and his blood cultures grew Klesiell pneumoniae. Records from January 9, taken by Anne R. Tintinalli, M.D., showed that Plaintiff complained of dizziness and lightheadedness (R. 408-09). On the same day, Padraic J. Sweeny, M.D., saw Plaintiff for a cardiology evaluation, and noted that Plaintiff had renal failure and hyperkalemia (R. 410). Chest X-rays showed that Plaintiff's heart was enlarged and lungs congested (R. 418). Notes taken on January 21, after Plaintiff's January 13 stent placement, showed that Plaintiff still had blockage in the right coronary artery (R. 402).

April 14, 2004, notes from Dr. Young show that Plaintiff's hepatitis C is partially treated (R. 514). May 7, 2004, notes show that Plaintiff presented suffering from the flu (R. 522).

On June 25, 2004, P. Patel, M.D., at the request of the Family Independence Agency, saw Plaintiff for an internal medical evaluation (R. 427-29). Dr. Patel stated that Plaintiff is on a good prophylactic regime to treat his asthma (R. 429). The same day, Plaintiff underwent a psychiatric evaluation by psychiatrist A.C. Shah, M.D., who noted that Plaintiff was depressed, anxious, fearful but friendly (R. 432-34). Plaintiff has good contact with reality, but has low self-esteem (R. 433). Plaintiff correctly computed simple math problems. He was diagnosed with a major depressive disorder recurrent with psychotic features and a global assessment of functioning (GAF)of 45[4] (R. 434).

---

[4]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC.,

On July 29, 2004, Plaintiff was subject to a Physical Residual Functional Capacity Assessment which noted that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk at least 2 out of 8 hours, sit about 6 out of 8 hours and had no push/pull restrictions (R. 160-167, 161).

On August 25, 2004, a Psychiatric Review Technique conducted by Dr. Khademian assessed Plaintiff under Listings 12.04 and 12.09 (R. 168-85). Per Listing 12.04, Plaintiff was determined to possess a depressive syndrome characterized by sleep disturbance, decreased energy, feelings of guilty/worthlessness and difficulty concentrating/thinking (R. 171). Under Listing 12.09, it was noted that Plaintiff abused ETOH (R. 176). Dr. Khademian noted that Plaintiff's limitations on daily living, social interaction and maintaining concentration were moderate, and he had no periods of decompensation (R. 178).

On December 21, 2004, Dawn Roxborough, a nurse practitioner at Wayne State University Medical School, completed Plaintiff's progress report noting that his hepatitis C was clinically stable (R. 448-49).

On March 8, 2005, Plaintiff was discharged after undergoing a left heart catheterization at the Detroit Medical Center (R. 464, 460-513). Upon discharge, Plaintiff was free of chest pain, allergic reaction, bleeding, and pain at catheter insertion site (R. 506)

---

DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

On August 1, 2005, Kimberly Ruply, medical assistant, completed a Medical Source Statement Concerning Nature and Severity of an Individual's Physical Impairment for Plaintiff (R. 526-32). Ms. Ruply indicated that Plaintiff has not been capable of performing sustained sedentary or light work on a regular and continuing basis (R. 526-27). She indicated that even if Plaintiff had freedom to alternate sitting and standing, he would still be unable to perform light or sedentary work whether sitting, standing or walking (R. 527-28). Ms. Ruply indicated Plaintiff cannot regularly lift 0-5 pounds (R. 528). Further, she indicated that Plaintiff is not capable of extending his hands, reaching or grasping, fingering or feeling objects (529-30). Plaintiff is unable to stoop, kneel or crouch (R. 530-31). Ms. Ruply opined that Plaintiff has been diagnosed with coronary artery heart disease which prevents him from any of the listed duties (R. 531).

On January 5, 2006, Plaintiff was discharged from Detroit Medical Center after being admitted on January 3 due to congestive heart failure exacerbation (R. 533-35). Graciela Rojas, M.D., stated that Plaintiff presented with difficulty in breathing, and that he is noncompliant with his medication (R. 533). A chest X-ray showed cardiomegaly (R. 534). Plaintiff was told to stop any activity at the first sign of chest pain, heaviness or tightness, or increased shortness of breath. Plaintiff is alternate activity periods with rest and break up large activities into smaller tasks.

**3.** ***Vocational Evidence***

ALJ Golden asked VE Barrett the foolishly obvious question if there were any unskilled jobs in the economy. VE Barrett stated that there were. The ALJ then asked for numbers and examples of sedentary and light level jobs. VE Barrett stated that sedentary level jobs include

bench operations, packaging, sorting inspection and assembly, and light exertional jobs include machine operator, janitor and car detailing.  There are about 5,000 sedentary level and 11,000 light exertional jobs in metropolitan Detroit (R. 615-16).  There were 9,000 and 20,000 such jobs respectively in the state.

ALJ Golden asked if a person, with sufficient concentration to perform routine, simple tasks could perform these jobs, and VE Barrett stated that they could (R. 616).  ALJ Golden asked if a person who could not concentrate enough to do simple tasks could perform these jobs, and ALJ Barrett replied that they could not.  The Plaintiff's attorney inquired whether sedentary and light jobs could be performed if a person was required to take naps, throughout the day, due to medication.  The VE stated that if a person needed to rest more than 15 minutes in the morning, a half hour at lunch and 15-20 in the afternoon, they would be precluded from such jobs.  Counsel then inquired about an individual who needed to elevate their legs at waist level, and the VE stated that such a person would be precluded from these jobs.  Finally, counsel asked how many absences would be tolerated for a person with a medical condition, and the VE stated that one or two absences a month would be acceptable (R. 617).

**4**.      *ALJ Golden's Decision*

In his decision, ALJ Golden noted that Plaintiff has not engaged in substantial gainful activity since March 29, 2004, the alleged onset date, and that he has the following "severe" impairments: hepatitis C, coronary artery disease status post stenting, defibrillator implantation, mild left shoulder impingement, asthma/chronic obstructive pulmonary disease and major depressive disorder (R. 19).  While severe, Plaintiff does not have any impairment, alone or in

combination, that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 20).

The ALJ concluded that Plaintiff has the residual functional capacity (RFC) to lift 20 pounds occasionally; lift 10 pounds frequently; sit for two of eight hours in a work day; stand or walk for six of eight hours in a work day; push or pull without limitation; perform postural activities occasionally; perform any manipulative functions; see, hear and speak without limitation; and perform work in any environment. Mentally, Plaintiff can understand and remember and carry out simple instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in routine work setting (R. 21). ALJ Golden found that Plaintiff had no past relevant work experience (R. 24).

Considering Plaintiff's age, education, work experience and RFC, ALJ Golden determined that there exist in significant numbers in the national economy jobs that Plaintiff can perform. ALJ Golden concluded that Plaintiff has not been under a "disability" as defined in the Social Security Act since March 29, 2004, the date the application was filed.

II. ANALYSIS

A. Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[5]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.    Factual Analysis

In filing his motion for summary judgment, Plaintiff asserts that ALJ Golden"s decision was in error because: (1) ALJ Golden did not pose a complete and accurate hypothetical question to the vocational expert; (2) ALJ Golden failed to properly evaluate Plaintiff's credibility about

---

[5] *See, e.g.*, *Varley v.  Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir.  1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v.  Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir.  1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v.  Heckler*, 810 F.2d 786, 790 (8th Cir.  1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinburger*, 514 F.2d 293, 294 (6th Cir.  1975); *Noe v.  Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

his limitations, abilities and medication side effects; (3) the record does not support the conclusion that Plaintiff has the RFC to perform light work; and (4) the decision to deny Plaintiff disability benefits was not based upon substantial evidence (Dkt. # 7, p. 1).

### 1. *Inaccurate Hypothetical:*

Plaintiff claims that the ALJ asked the VE an incomplete hypothetical question because he never included all of Plaintiff's impairments and limitations. The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). To meet the burden of showing that Plaintiff could perform work that is available in the national economy, the Commissioner must make a finding "supported by substantial evidence that [he] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This kind of "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [his] individual physical and mental impairments.'" *Id.* (citations omitted).

ALJ Golden's awkward and inartful hypothetical questions to VE Barrett included Plaintiff's substantiated impairments and resultant limitations as of March 29, 2004, his date of application for SSI benefits. ALJ Golden asked two obvious questions: (1.) if there were "unskilled jobs in existence in this economy," and (2.) if there were "any in the sedentary and light levels" (R. 615). The ALJ then asked if a person with sufficient concentration to perform the simple, routine tasks could perform the sedentary, light jobs (R. 616). She asked if someone requiring naps or needing to elevate their legs at waist level would be precluded from working.

Finally, she asked how many absences would be permitted on account of illness (R. 617). Plaintiff's counsel chose to ask few questions (R. 616-17).

The hypothetical questions that the ALJ posed to the VE took into consideration limitations that accurately reflected the difficulties Plaintiff experienced and were supported by the record as a whole. Unlike many cases, both of Plaintiff's psychological evaluations found Plaintiff not significantly limited on most characteristics and only moderately limited on a few (R. 152, 156-57, 178, 182-83). Therefore, the ALJ reasonably determined that in spite of his heart condition, hepatitis C, asthma and major depressive disorder, Plaintiff has the residual functional capacity (RFC) to lift 20 pounds occasionally; lift 10 pounds frequently; sit for two of eight hours in a work day; stand or walk for six of eight hours in a work day; push or pull without limitation; perform postural activities occasionally; perform any manipulative functions; see, hear and speak without limitation; and perform work in any environment. Mentally, Plaintiff can understand and remember and carry out simple instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in routine work setting (R. 21).

Because the ALJ relied on the pertinent evidence within the record, he reasonably determined that Plaintiff was not disabled but could perform a significant number of jobs, including 5,000 sedentary and 11,000 light exertional jobs (R. 616). Accordingly, substantial evidence supports the agency's decision that the Plaintiff was not disabled.

### 2. *ALJ Golden Improperly Evaluated Plaintiff's Credibility:*

Subjective evidence is only considered to "the extent…[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)). The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion. *Kirk v. Secretary of health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

In order for an ALJ to properly discredited a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but rather they must be specific. The ALJ must say more than the testimony is not credible. *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Id*. at 1039.

ALJ Golden had substantial evidence to discredit Plaintiff's subjective testimony. He found the Plaintiff's "work history, or lack thereof, does not lend to his overall credibility. The intensity, severity and frequency of claimant's report symptoms is not supported by the objective evidence in this case" (R. 23). Similarly, Plaintiff's denials of any drug use, in direct contradiction of the record, also undermined his credibility. ALJ Golden found that Plaintiff's

19

claims were, "not supported by clinical findings .... simply put, this record does not support the overall degree of pain, discomfort or other limitations alleged" by Plaintiff. ALJ Golden noted that despite Plaintiff's testimony regarding his lower back problems and limitations, the record did not indicate persistent treatment for lower back pain. Furthermore, Plaintiff's cardiac problems have responded well to treatment when Plaintiff adhered to his medication regime, and his hepatitis C was determined to be stable.

In his brief, Plaintiff claims that ALJ Golden minimized Plaintiff's symptoms regarding his mental health (Dkt. # 7, p. 7-8). There is ample evidence countering Plaintiff's assertions about his mental health including two Mental Residual Functional Capacity Assessments which determined that Plaintiff had, at worst, only a couple of moderate limitations in functioning. ALJ Golden found Dr. Shah's analysis of Plaintiff's mental health inconsistent with the weight of objective medical evidence in the record. ALJ Golden did not find Plaintiff credible when looking at the record as a whole, and he properly discredited Plaintiff's testimony.

### 3. *Plaintiff's Capacity to Perform Light Work:*

Plaintiff argues that the record does not support the conclusion that Plaintiff has the RFC to perform light work (Dkt. # 7, p.1). Such an argument is without merit. Both of the Physical Residual Functional Capacity Assessments of Plaintiff suggest that he can perform light work (R. 134, 167). Moreover, even if Plaintiff's argument were accepted, the ALJ also found Plaintiff could perform 5,000 sedentary jobs locally (R. 23). *See Hall v. Bowen*, 837 F.2d 272, 273, 275-76 (6th Cir. 1988) (1,350 jobs is a significant number of jobs in Dayton area and national economy). Thus, the ALJ's decision is supported by substantial evidence in the record, and should be affirmed.

## III.    RECOMMENDATION

For the reasons stated above, it is recommended that Defendant's Motion for Summary Judgment be **GRANTED** and Plaintiffs motion be **DENIED**.  Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


DATED: December 26, 2007                           s/ Steven D. Pepe
                                                  STEVEN D. PEPE
                                                  United States Magistrate Judge

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 26, 2007 , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification to the following: and I hereby certify that I have mailed by U.S. mail the paper to the following non-ECF participants: Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606

s/Alissa L. Greer
Case Manager to Magistrate Judge Steven D. Pepe
(734) 741-2298